JOSE L. VIVAS *et al.*, Plaintiffs-Appellees, v. THE BOEING COMPANY *et al.*, Defendants-Appellants.

First District (1st Division)  Nos. 1—08—2726, 1—08—2740 cons.

Opinion filed June 15, 2009.

William T. Cahill and Scott F. Seablom, *pro hac vice*, both of Perkins Cole LLP, of Chicago, for appellant The Boeing Company.

Ralph V. Pagano, *pro hac vice*, of Mendes & Mount, of New York, for appellant United Technologies Corporation.

Donald J. Nolan and William J. Jovan, both of Nolan Law Group, of Chicago, Floyd A. Wisner, of Wisner Law Firm, of St. Charles, and Paul Jon Layne, *pro hac vice*, of Silva & Silva, of Coral Gables, Florida, for appellees.

PRESIDING JUSTICE ROBERT E. GORDON delivered the opinion of the court:

After an airplane flight crashed near Pucalpa, Peru, on August 23, 2005, plaintiffs brought claims of product liability and of negligent design, manufacture and warning against defendant The Boeing Company (Boeing), which designed and manufactured the airplane, and defendant United Technologies Corporation (UTC), which manufactured the airplane's engines. Plaintiffs were the survivors of the crash and representatives of decedents who died in the crash.

Defendants moved to dismiss on the grounds of *forum non conveniens* in favor of an action in the Republic of Peru, and the circuit court of Cook County denied the motion. This interlocutory appeal followed.

Defendants sought an action only in Peru, not in the state of Washington, where defendant Boeing assembled the aircraft, and not in the state of Connecticut, where defendant UTC manufactured the aircraft's engines. Since defendants did not seek an action in another state, the issue before us is only whether Peru is a more convenient forum.

For the reasons discussed below, we cannot find that the trial court abused its discretion by denying defendants' motion to dismiss on *forum non conveniens* grounds. On the one hand, all of the evidence relevant to the design, manufacture and assembly of the aircraft and its engines is in the United States. In addition, a significant portion of the evidence regarding the crash is also in the United States, as a result of the participation of the American defendants and American authorities in the investigation of the crash by the Peruvian government. On the other hand, a significant portion of the crash evidence is likely to be still in Peru. Given these facts, we cannot find that the trial court abused its discretion by balancing the relevant factors and denying defendants' motion.

## BACKGROUND

The following facts are not in dispute. On August 23, 2005, an airplane departed from Lima, Peru, heading toward Pucalpa, Peru, and crashed while attempting to land at an airport in Pucalpa. Of the 98 persons on board the airplane, 58 survived. The subject aircraft was designed, assembled and sold in the state of Washington by defendant Boeing, and its engines were designed, manufactured and sold in the state of Connecticut. On August 14, 1981, the aircraft and its engines were delivered in the state of Washington to South African Airways, pursuant to a purchase agreement with the Republic of South Africa. In June 2005, just a few months before the crash, the aircraft was leased by a South African entity to a Peruvian entity, which operated the subject flight.

## The Parties

Plaintiffs are survivors of the airplane crash, as well as representatives of decedents. These 16 consolidated actions concern the deaths of 18 passengers and 2 members of the flight crew; and the injuries to 47 passengers and 2 flight attendants. Thus, the actions pertain to 69 of the 98 passengers.

Although plaintiffs are primarily residents of Peru, some plaintiffs are United States citizens. Specifically, 42 of the 49 personal injury plaintiffs are Peruvian citizens and residents; 1 is a Brazilian; and 6, who are members of the Vivas family, are United States citizens who reside in New York. Of the 20 decedents, 18 were Peruvian; 1, Columbian; and 1, Spanish.

One of the plaintiffs, Jessica Wilburs, is a United States citizen and an Illinois resident. On August 22, 2007, Wilburs was appointed, by the circuit court of Cook County, as a special administrator to represent the estate of decedent, Eleazar Valenzuela, and to act on behalf of his survivors, namely, his widow and three minor children.[1]

Defendant UTC manufactured the airplane engine, while defendant Boeing assembled the aircraft, which was a 24-year-old Model 737. Both defendants are Delaware corporations. Defendant UTC has its principal place of business in Connecticut, where the engine was manufactured. Boeing has its headquarters in Chicago, Illinois, where suit was filed. However, the aircraft at issue was assembled in the state of Washington, where Boeing formerly had its headquarters.

---

[1]The complaint in this particular action was originally filed on December 7, 2006, with Patricia Savedra, decedent's widow, named as the plaintiff. After Wilburs was appointed as special administrator, she filed an amended complaint on August 22, 2007, which listed Wilburs as the plaintiff.

Transporte Aereos Nacional De Selva, S.A., of Peru (TANS), which operated the downed flight 204, was originally named as a defendant, but is no longer a party to these consolidated actions. TANS was originally named as a defendant in 11 of the consolidated actions. Approximately half of the consolidated actions were removed to federal court. On August 21, 2007, a federal district court granted TANS's motion to dismiss under the Foreign Sovereign Immunities Act of 1976 (28 U.S.C. §§1330, 1332(a)(2) through (a)(4), 1391(f), 1441(d), 1602 *et seq.* (2000)). On August 23, 2007, the cases pending in federal court were remanded to the circuit court of Cook County. Plaintiffs in the other actions voluntarily dismissed TANS. Thus, TANS is no longer a defendant in the consolidated actions.

In an attorney affidavit submitted in support of its *forum non conveniens* motion, defendant Boeing claimed that TANS was "reported" to have settled a number of the personal injury and wrongful death claims. Attached as an exhibit to the affidavit was "the form of release and an English translation." The release purported to release not only TANS but also "[t]he manufacturer of the aircraft" and "[a]ny person involved in the manufacture, repair, maintenance, service or piloting of the aircraft, and/or of any of its motors, parts, and components." In its appellate brief, defendant Boeing claims that "it is likely" that all the evidence relating to the releases is in Peru. However, defendant Boeing does not claim that it knows for certain whether these releases were, in fact, executed.

### The Claims

The complaints in the consolidated actions included claims against defendants Boeing and UTC for product liability and for the negligent design, manufacture, assembly, sale and warning concerning the airplane and its engines. Plaintiffs' claims concerned the alleged inability of the aircraft and the engine to operate safely in a tropical environment. Plaintiffs' claims included allegations that the aircraft was incapable of continued safe flight in tropical environments when the clouds contain high liquid-water content; that the engine's design failed to adequately deflect precipitation away from the engine core; that the engine had a relight system that failed to properly energize igniters in the engine in the event of a flameout; and that the aircraft incorporated a windshear detection system design that failed to provide adequate warnings to the flight crew. Plaintiffs also alleged that defendants failed to provide adequate instructions and warnings about the safe operation of the airplane and the engines in a tropical environment.

Evidence of Aircraft Design: In United States

Defendant Boeing concedes that it assembled the aircraft at issue in this lawsuit and that the evidence relevant to the aircraft's design and assembly is located in the United States, specifically in the states of Washington and Kansas. In support of its *forum non conveniens* motion, defendant Boeing submitted the affidavit of Richard Breuhaus,[2] the chief engineer of its air safety investigation group. With respect to the aircraft's design and assembly, Breuhaus stated:

"The subject aircraft was assembled in the state of Washington. Boeing's activities in connection with the design, manufacture, assembly, testing, certification, and customer support services for 737 model aircraft were and are based primarily in the State of Washington, although some of this activity occurred in Kansas. Documents and witnesses within Boeing's possession, custody and control relating to the design, manufacture, assembly, testing, certification, and customer support services for all Boeing 737 model aircraft, including model 737-244, aircraft, are located mostly in the State of Washington, although some are in Kansas."

Defendant UTC concedes that it manufactured the engines at issue in this lawsuit and that the evidence relevant to the engine's design and manufacture is located in the United States, specifically in the state of Connecticut. Michael Barton, the manager of the flight safety office, testified in his discovery deposition[3] that the subject engines were designed and manufactured in Connecticut.

Specifically, Barton testified that the JT8D-17A engines manufactured by defendant UTC were the engines used on the aircraft at issue; that the JT8D engine was first developed by defendant UTC in the late 1950s or early 1960s; and that the 17A version was first certified for use in 1982. Barton testified that all the design documents for the JT8D series of engines are located in Connecticut; that the testing of the JT8D-17A engine design was performed either in Connecticut or Florida; that each individual engine is also tested; that this individual testing is also performed in either Connecticut or Florida; and that the testing documents are located in Connecticut. Barton further testified that any correspondence or documents concerning defendant Boeing's use of the JT8D-17A engine in its aircraft or concerning changes in the engine's manual would also be located in

---

[2]All references in this Background section to statements made by Breuhaus are taken from his affidavit, submitted in support of defendant Boeing's *forum non conveniens* motion.

[3]All references in this Background section to statements made by Barton are taken from his discovery deposition.

Connecticut. Barton testified that service bulletins issued by defendant UTC are also located in Connecticut.

## Evidence of Crash: Partly in United States

A significant portion of the evidence relevant to the crash is located not in Peru, but in the United States.

Evidence of the crash came to the United States as a result of the participation of the American defendants and American authorities in an investigation initiated by the Peruvian government. Richard Breuhaus, defendant Boeing's chief engineer for air safety, explained in his affidavit that after the crash of flight 204, Peru's Comisión de Investigación de Accidents e Incidentes de Aviación Civil (CIAIAC) conducted an investigation into the crash. During the investigation, CIAIAC received technical support and assistance from several sources, including defendants Boeing and UTC; the United States National Transportation Safety Board (U.S. Safety Board); and the United States Federal Aviation Administration (U.S. Aviation Administration).

### a. Engine Disassembly

Breuhaus stated that, after the crash, the engines were located and shipped to Lima, Peru, for disassembly and examination. The engines were disassembled and examined in the presence of representatives of defendant Boeing, defendant UTC and the United States Safety Board. Breuhaus stated that defendant UTC drafted an "Engine Examination Report" that documented the findings, analyses and conclusions reached during the engine disassembly and examination.

The records and notes made by the American representatives to document the disassembly, as well as the American representatives themselves, are in the United States. Barton testified in his deposition that two investigators from defendant UTC were present at the engine disassembly; that one investigator currently works at UTC's Connecticut office; that the other investigator is retired but still resides in Connecticut; and that the two investigators took photographs and "contributed to the teardown report." Barton testified that the photographs and the report are located in UTC's Connecticut office.

### b. Engine Compressor Blades

Breuhaus stated that the engine compressor blades were sent to Washington, D.C., for further analysis. Defendant UTC's engine examination report referred to a report by the U.S. Safety Board entitled "NTSB Materials Laboratory Factual Report No. 06—005, examination of 'Rood portions of 15 8th stage compressor blades,' dated 14 January 2006."

Barton testified in his deposition that the compressor blades from one of the engines were sent to the U.S. Safety Board "to be examined for understanding of the surface fractures," and that defendant UTC received a copy of a subsequent report from the U.S. Safety Board.

### c. Site Investigation

Breuhaus stated that, in late August 2005, shortly after the crash, a Boeing investigator who resides in Washington state flew to the crash site and was able to inspect and photograph portions of the wreckage, including parts of the engine cores. Breuhaus stated that most of the wreckage had already been removed by looters. The investigator's notes and photographs are in the state of Washington.

Breuhaus stated that the Boeing investigator was part of an investigative team that included representatives of defendant UTC, the U.S. Aviation Administration, and the U.S. Safety Board, as well as Peruvian officials. Breuhaus stated that the investigators reviewed photographs taken immediately after the accident and photographs taken during the initial Peruvian emergency response to the accident. The investigators interviewed witnesses to the accident and emergency response personnel. As noted above, Breuhaus stated that the notes and photographs of the Boeing investigator are in the state of Washington.

Barton, defendant UTC's flight safety manager, testified that defendant UTC sent one investigator to the on-site investigation in Peru in August 2005; that the investigator was there for three or four days; that he took dozens of photographs and recorded "several dozen pages" of field notes; that the UTC investigator works in UTC's Connecticut office; and that the investigator's notes and photographs are located in the Connecticut office.

### d. Cockpit and Flight Recorders

Breuhaus stated that the cockpit voice recorder and the flight data recorder[4] were recovered and sent by Peruvian authorities to the U.S. Safety Board for analysis. The U.S. Safety Board's laboratories are located in Washington, D.C. Although the flight data recording was unreadable, the U.S. Safety Board was able to extract sounds and voices from the cockpit voice recording. On September 9, 2005, a group gathered to listen to the audio recording on the cockpit voice recorder. The group included representatives of the U.S. Safety Board, the

---

[4]In his affidavit, Breuhaus used the abbreviations "CVR" and "FDR" without explaining their meaning. However, Barton testified in his deposition about the "cockpit voice recorder" and the "flight data recorder." Thus, this court will presume that these abbreviations stood for these terms.

Peruvian government, defendant UTC and defendant Boeing. The U.S. Safety Board also performed a sound spectrum analysis on the cockpit voice recording. The parties have not claimed that the cockpit voice recorder and the flight data recorder, as well as the results of tests performed upon them, were removed from Washington, D.C.

### e. Weather Conditions

Evidence of the weather conditions at the time and place of the accident is located, in part, in the United States. This evidence was collected by both the U.S. Safety Board and defendant Boeing.

First, with respect to the U.S. Safety Board, Breuhaus stated that the Board provided Peruvian authorities with the information and the analysis of the weather conditions at the time of the crash. Presumably, this information is located in Washington, D.C. The Peruvian CIAIAC report of the crash referred to and relied upon a "factual report" issued by the U.S. Safety Board concerning the climate conditions in the area at the time of the flight, including satellite photographs that were taken.

Second, defendant Boeing stated in its interrogatory responses that "shortly after the accident, a Boeing employee performed a preliminary weather analysis based on satellite data, an atmospheric reading taken at Manaus, Brazil, and automated surface observations reported for" Tabatinga, Brazil, and Cabaja, Brazil. Defendant Boeing stated in its appellate brief that this employee is located in the state of Washington.

### f. Maintenance Records

Barton, defendant UTC's flight safety manager, testified that the UTC "file [in Connecticut] may have some copies of maintenance records." Barton explained that defendant UTC has "a communication system that we use with our field representatives to collect information from the customers," that the system contains some "information for the serial number engines that were involved in the accident," and that this information is located in Connecticut. However, Barton testified that UTC's field representative for TANS, which operated the subject flight, is located in Buenos Aires, Argentina.

Breuhaus stated in his affidavit that "documents and witnesses within Boeing's possession, custody and control relating to *** customer support services for all Boeing 737 model aircraft, including model 737-244, aircraft, are located mostly in the State of Washington, although some are in Kansas."

However, the maintenance records for the period between when TANS leased the airplane in June 2005, and when the airplane crashed in August 2005, are likely to be found in Peru.

### g. Other Records

Breuhaus stated that defendant Boeing has in its possession: (1) a written summary prepared by Peruvian authorities of communications with air traffic personnel concerning the accident; and (2) a copy of a video recording prepared by Peruvian authorities of the postcrash search and rescue effort.

## Evidence of the Crash: Partly in Peru

A significant portion of the evidence and witnesses relevant to the aircraft's crash are likely to be found in Peru. However, for much of this evidence, it is unknown whether it has been preserved during the four years since the crash, and the location of many of the witnesses and pieces of evidence is unknown.

Breuhaus, defendant Boeing's chief engineer for air safety, stated in his affidavit that Peru's Direccion General de Aeronautica Civil (DGAC) is similar to the U.S. Aviation Administration, that DGAC "reportedly" suspended TANS's operating certificate in 2006 after the crash; and that, upon information and belief, any of DGAC's records relating to its regulation of TANS are located in Peru.

Breuhaus also stated that the DGAC inspected the subject aircraft in South Africa in June 2005, only three months before the crash, before issuing an airworthiness certificate. Breuhaus "believe[s]" that "it is likely" that the inspection records are located in either Peru or South Africa.

Breuhaus stated that the Corporacion Peruana de Aeropuertos y Aviacion Comercial (CORPAC) operated the main airport in Pucalpa, Peru; that at the time of the crash, the runway lights were not operating and a portion of the runway was closed due to construction; and that records of and personnel with knowledge of the airport's conditions on the day of the crash are "likely" in Peru.

Breuhaus stated that, although defendant Boeing received a written summary prepared by CORPAC of communications with air traffic control personnel concerning the accident, the personnel who were in the air traffic tower that day, and who had personal knowledge concerning visibility and weather conditions, are "likely" located in Peru. In addition, "if preserved," any recordings of communications and any records of interviews of air traffic control personnel are located in Peru.

Breuhaus stated that the Peruvian Air Force (FAP) assisted in the crash investigation; that FAP personnel were present at the crash site; and that one of them "reportedly" located the aircraft's cockpit voice recorder, which was subsequently sent to Washington, D.C., for analysis. The FAP had custody of the flight crew members' medical

files and flight certificates. Breuhaus stated that it is "likely" that FAP records and personnel are located in Peru.

Breuhaus stated that defendant Boeing received a copy of a video recording, made by the municipality of Coronel Potillo, of the post-crash search and rescue effort. However, Breuhaus believed that there were more video recordings and that these recordings, as well as the search-and-rescue workers, are located in Peru. Other witnesses and evidence, with a likely location in Peru, include: the autopsy reports and the personnel involved; the surviving crew members; records of interviews with crew members; the pilot and copilot's performance records; and TANS's maintenance records of the aircraft during the three months since its leasing.

## Evidence: Unknown Location or Destroyed

### a. Accident Site

Although the airport is obviously in Peru, there is evidence that its appearance was altered. Breuhaus stated that the Pucalpa airport was under construction at the time of the crash, in August 2005. Presumably, four years later, the construction has been completed or has proceeded, such that the appearance of the airport has been altered significantly since the date of the crash.

### b. Airplane Wreckage

Breuhaus stated that looters had already removed most of the airplane wreckage in just a few days after the crash. Other than the cockpit voice recorder, the flight data recorder, and the engine compressor blades that were removed to the United States, the location of the rest of the airplane parts has not been identified.

Breuhaus stated "upon information and belief" that the location of the engines is in Peru, but he was unable to provide specific factual support of their continued existence or precise location. Both Breuhaus and Barton stated that the engines had been subjected to a disassembly or "teardown" after the crash.

### c. Witnesses to Crash Events

The witnesses to the events immediately surrounding the crash and its aftermath were, obviously, located in Peru at the time of the crash. These potential event witnesses include: air traffic controllers and other airport personnel; search-and-rescue workers; medical personnel; and people involved in the autopsies of the deceased. While the present location of these witnesses is likely to be in Peru, their current residence, four years after the crash, has not been specifically identified.

### Trial Court's Ruling

On September 12, 2007, the trial court consolidated 16 cases concerning the plane crash. On November 19, 2007, defendants Boeing and UTC filed motions to dismiss all 16 cases on the ground of *forum non conveniens*. Specifically, defendants moved to dismiss in favor of an action in the Republic of Peru. In their motions, defendants admitted that evidence regarding the design and assembly of the aircraft and its engine is located in the United States. However, defendants argued that this action should proceed in Peru because much of the evidence regarding damages is located there. Defendants did not seek an action in either the state of Connecticut, where defendant UTC manufactured the airplane engine, or the state of Washington, where defendant Boeing assembled the aircraft. In their motions, defendants sought an action only in Peru.

On September 2, 2008, the trial court heard argument on defendants' *forum non conveniens* motions; and on September 5, 2008, the trial court entered a written order denying defendants' motions. In its written order, the trial court made the following findings.

First, the trial court found that defendants' *forum non conveniens* motions were timely, because they were filed within 90 days after the cases were remanded to the state court by the federal court.

Second, the trial court found that Peru was an adequate alternative forum. Plaintiffs had claimed that Peru was not an adequate alternative forum because: (1) a Peruvian court may decline jurisdiction over a refiled action; (2) plaintiffs' claims may be barred by Peru's two-year statute of limitations; (3) Peruvian laws do not provide for pretrial discovery; and (4) the Peruvian judicial system does not provide for jury trials, and is slow and corrupt.

Ruling on each of the plaintiffs' claims, the trial court found:

> "However, Defendants have agreed to consent to jurisdiction in Peru, and Defendants have agreed to waive any statute of limitations issues should they arise. Additionally, any procedural differences, such as the inability to commence pre-trial discovery or the inability [to] hold a jury trial, cannot be given much weight. A lack of pre-trial discovery and the inability to hold jury trials are common procedural difference[s] throughout various judicial forums. And, giving undue weight to these factors would make an American forum more attractive to foreign litigants. [Citation.] Thus, the differences between Illinois and Peruvian law do not completely deprive the Plaintiffs of a remedy. Finally, there is no real evidence that Plaintiffs would be unfairly treated by a Peruvian court. The public's dislike for the judicial system is not objective evidence of corruption."

For these reasons, the trial court found that Peru was an adequate available forum.

Third, the trial court found that plaintiffs' choice of forum was entitled to less deference, because few of the plaintiffs were United States citizens and none were Illinois residents. However, the trial court observed that *"less* deference is not the same as *no* deference." (Emphasis in original.)

Fourth, the trial court balanced the various factors that a trial court must consider in a *forum non conveniens* motion and found that they did not favor dismissal.

The "private interest factors" did not favor dismissal, because (1) defendants could not claim that Peru was a more convenient forum for them, since both defendants were American corporations, defendant Boeing was headquartered in Cook County, and their attorneys' offices were also in Cook County; (2) Peru did not offer greater ease of access to witnesses and proof, or lower costs to obtain them, since potential trial witnesses and sources of proof were scattered among various states and countries; and (3) viewing the accident site is less important in a product liability case, such as this one, since the jury does not usually need to view the site to resolve claims of a defective product.

The "public interest factors" did not favor dismissal, because: (1) defendant failed to show that Cook County was a more congested forum than Peru; (2) Illinois residents have an interest in resolving defective product claims against defendant corporations where one is headquartered in Cook County and both are doing business in Illinois; and (3) while there is an interest in having local controversies decided locally, there is less weight given to an accident site in a product liability case.

For these reasons, the trial court concluded that the balance of private and public interest factors did not favor dismissal on *forum non conveniens* grounds. On appeal, defendants ask us to find that the trial court abused its discretion in weighing and balancing these factors.

On October 3, 2009, defendant Boeing filed a petition with the appellate court for leave to appeal the trial court's denial of its *forum non conveniens* motion. The petition was filed with a 19-volume supporting record, authenticated by an affidavit of an attorney representing defendant Boeing. On October 6, 2008, defendant UTC filed a similar petition, relying on the supporting record filed by defendant Boeing. On November 14, 2008, the appellate court granted defendants' petitions for leave to appeal, and this interlocutory appeal followed.

## ANALYSIS

### Interlocutory Appeal

This is an interlocutory appeal, taken pursuant to Supreme Court Rule 306. 210 Ill. 2d R. 306. The rule provides in relevant part:

> "(a) *** A party may petition for leave to appeal to the Appellate Court from the following orders of the trial court:
>
> ***
>
> (2) from an order of the circuit court allowing or denying a motion to dismiss on the grounds of *forum non conveniens* ***."

210 Ill. 2d R. 306(a)(2).

On November 14, 2008, this court granted defendants' petition for leave to appeal the trial court's denial of their *forum non conveniens* motions.

Supreme Court Rule 306(c) requires that the petition for leave to appeal must be accompanied by a "supporting record" (210 Ill. 2d R. 306(c)), as that term is defined by Supreme Court Rule 328 (155 Ill. 2d R. 328). Supreme Court Rule 328 permits a "supporting record" to be authenticated either by a certificate of the circuit court clerk or "by the affidavit of the attorney or party filing it." 155 Ill. 2d R. 328. In the case at bar, the supporting record was authenticated by an attorney's affidavit. After the petition was granted, this court did not order defendants to file a record, as permitted by Supreme Court Rule 306(h), and no party to the appeal requested that additional portions of the record be prepared, as permitted by Supreme Court Rule 306(f). 210 Ill. 2d R. 306. Thus, this appeal proceeded based on the supporting record filed by defendant Boeing with its petition for leave to appeal.

### *Forum Non Conveniens* Doctrine

*Forum non conveniens* is an "equitable doctrine founded in considerations of fundamental fairness and the sensible and effective administration of justice." *Langenhorst v. Norfolk Southern Ry. Co.*, 219 Ill. 2d 430, 441 (2006); *Gridley v. State Farm Mutual Automobile Insurance Co.*, 217 Ill. 2d 158, 169 (2005). This doctrine permits a trial court to transfer a case when "trial in another forum 'would better serve the ends of justice.' " *Langenhorst*, 219 Ill. 2d at 441, quoting *Vinson v. Allstate*, 144 Ill. 2d 306, 310 (1991); *Gridley*, 217 Ill. 2d at 169.

The burden is on the party asking for the dismissal to show that the relevant factors " 'strongly favor' " transfer. (Emphasis omitted.) *Langenhorst*, 219 Ill. 2d at 443, quoting *Griffith v. Mitsubishi Aircraft International, Inc.*, 136 Ill. 2d 101, 107 (1990); *Woodward v. Bridgestone/Firestone, Inc.*, 368 Ill. App. 3d 827, 833 (2006) (in product

liability case where vehicle accident was in Australia with an Australian plaintiff, burden was on defendant to show factors strongly favoring transfer to Australia); *Ellis v. AAR Parts Trading, Inc.*, 357 Ill. App. 3d 723 (2005) (in product liability case where airplane crash was in the Philippines with Philippine decedents, burden was on defendant to show factors strongly favoring transfer to the Philippines).

"A trial court is afforded considerable discretion in ruling on a *forum non conveniens* motion." *Langenhorst*, 219 Ill. 2d at 441. An appellate court will reverse a circuit court's decision on a *forum non conveniens* motion only if the "defendants have shown that the circuit court abused its discretion in balancing the relevant factors." *Langenhorst*, 219 Ill. 2d at 442; *Gridley*, 217 Ill. 2d at 169; *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177 (2003). The Illinois Supreme Court has stated: "A circuit court abuses its discretion in balancing the relevant factors only where no reasonable person would take the view adopted by the circuit court." *Langenhorst*, 219 Ill. 2d at 442; *Gridley*, 217 Ill. 2d at 169; *Dawdy*, 207 Ill. 2d at 177.

The issue, then, is not what decision we would have reached if we were reviewing the facts on a clean slate, but whether the trial court acted in a way that no reasonable person would. We find, in the case at bar, that a reasonable person could certainly have taken the view adopted by the trial court.

## Plaintiffs' Choice of Forum

Before weighing the relevant factors, a court must first decide how much deference to give to a plaintiff's choice of forum. *Langenhorst*, 219 Ill. 2d at 448 (the supreme court determined the appropriate amount of deference, before weighing the relevant factors).

In the case at bar, the trial court reasonably accorded some deference to plaintiffs' choice of forum. Normally, the plaintiff's choice of forum is a "substantial" factor in deciding a *forum non conveniens* motion. *Dawdy*, 207 Ill. 2d at 172; *Griffith v. Mitsubishi Aircraft International, Inc.*, 136 Ill. 2d 101, 106 (1990). However, the Illinois Supreme Court has stated that where the plaintiff chooses a forum other than where she resides, her choice "is not entitled to the same weight" as the choice of her home forum. *Dawdy*, 207 Ill. 2d at 173-76; *Gridley*, 217 Ill. 2d at 170. In the case at bar, most of the plaintiffs were Peruvian. Thus, their selection of a foreign forum "deserves less deference." *Griffith*, 136 Ill. 2d at 106, citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56, 70 L. Ed. 2d 419, 436, 100 S. Ct. 252, 266 (1981); *Langenhorst*, 219 Ill. 2d at 448; *Gridley*, 217 Ill. 2d at 170.

However, less deference is not the same as no deference. *First American Bank v. Guerine*, 198 Ill. 2d 511, 518 (2002) ("'the defer-

ence to be accorded is only *less*, as opposed to *none'* (emphases in original)"), quoting *Elling v. State Farm Mutual Automobile Insurance Co.*, 291 Ill. App. 3d 311, 318 (1997); *Ellis v. AAR Parts Trading, Inc.*, 357 Ill. App. 3d 723, 742 (2005) (less deference "does not equal no deference"). See also *Langenhorst*, 219 Ill. 2d at 448 (plaintiff's choice of a foreign forum was "entitled to *somewhat* less deference" (emphasis in original)), citing *Guerine*, 198 Ill. 2d at 517 ("somewhat less deference"). Thus, in the case at bar, the trial court reasonably accorded some deference to plaintiffs' choice of a forum.

## Private Interest Factors

The Illinois Supreme Court has held that a court must consider both "the private and public interest factors" in deciding a *forum non conveniens* motion. *Langenhorst*, 219 Ill. 2d at 443; *Gridley*, 217 Ill. 2d at 170; *Dawdy*, 207 Ill. 2d at 172-73. The private interest factors include: " '(1) the convenience of the parties; (2) the relative ease of access to sources of testimonial, documentary, and real evidence; and (3) all other practical problems that make trial of a case easy, expeditious, and inexpensive.' " *Langenhorst*, 219 Ill. 2d at 443, quoting *Guerine*, 198 Ill. 2d at 516-17; *Gridley*, 217 Ill. 2d at 170; *Dawdy*, 207 Ill. 2d at 172.

First, the convenience of the parties did not weigh in favor of transfer to Peru. With respect to this factor, "the defendant must show that the plaintiff's chosen forum is inconvenient to the defendant." *Langenhorst*, 219 Ill. 2d at 450. "[T]he defendant cannot assert that the plaintiff's chosen forum is inconvenient to the plaintiff." *Langenhorst*, 219 Ill. 2d at 445. Defendants are both American corporations; and defendant Boeing has its headquarters in plaintiffs' chosen forum.

Second, the relative ease of access to sources of testimonial, documentary and real evidence did not require transfer to Peru. Defendants claim that most of the evidence regarding the crash and any potential damages is located in Peru. As discussed in detail in the Background section of this opinion, a significant portion of the crash evidence is likely to still be found in Peru. Also, if liability is found, most of the evidence regarding plaintiffs' damages is presumably in Peru.

However, this is a product liability case, and all the evidence relevant to the design, manufacture and assembly of the aircraft and its engines is in the United States. *Woodward*, 368 Ill. App. 3d at 834 (denying motion to transfer to accident site in Australia, where "witnesses related to design, testing and accident rates" are scattered throughout the United States). Also, a significant portion of the

evidence regarding the crash is not in Peru, but in the United States, as a result of defendants' efforts to participate in the Peruvian crash investigation, with assistance from American authorities.

Observing correctly that potential witnesses and evidence were scattered among different states and countries, the trial court concluded that this factor did not tilt in favor of any one forum. We cannot find that this conclusion was an abuse of discretion. *Woodward*, 368 Ill. App. 3d at 834 (where potential witnesses are "scattered among different forums," no one forum can be said to be more convenient); *Ellis*, 357 Ill. App. 3d at 747 (same); *Berbig v. Sears Roebuck & Co.*, 378 Ill. App. 3d 185, 188 (2007).

As for the compulsory process of unwilling witnesses and the cost of obtaining the attendance of willing witnesses, these factors do not strongly favor dismissal in favor of Peru. "If the case remains in Illinois, witnesses in [Peru] are not compelled to come to the United States, and if the forum is changed to [Peru], American witnesses are not compelled to appear in [Peru]." *Woodward*, 368 Ill. App. 3d at 835 ("Peru" substituted for "Australia"); *Ellis*, 357 Ill. App. 3d at 743-44 (same reasoning applied to an airplane crash in the Philippines).

Similarly, while some of the documents regarding the crash are in Peru, many of the documents, records and photographs regarding the crash are also in the United States, and all the documents and records relating to design, manufacture and assembly are in the United States. Nonetheless, the location of documents, records and photographs has become a less significant factor in *forum non conveniens* analysis in the modern age of e-mail, Internet, telefax, copying machines and world-wide delivery services, since they can now be easily copied and sent. *Woodward*, 368 Ill. App. 3d at 834.

When considering access to evidence, a trial court should also consider "the possibility of viewing the premises, if appropriate." *Dawdy*, 207 Ill. 2d at 178. The Supreme Court criticized an appellate court for giving this factor "no weight." *Dawdy*, 207 Ill. 2d at 178. In *Dawdy*, the appellate court had concluded that " 'there is nothing in the record to indicate that a view of the accident site will be necessary.' " *Dawdy*, 207 Ill. 2d at 178 (quoting the appellate court below). The Supreme Court stated that "[t]his reasoning misses the mark." *Dawdy*, 207 Ill. 2d at 178. This factor "is not concerned with the *necessity* of viewing the site *** but rather is concerned with the *possibility* of viewing the site, if appropriate." (Emphases in original.) *Dawdy*, 207 Ill. 2d at 178. As always, this decision is left to the sound discretion of the trial court. *Dawdy*, 207 Ill. 2d at 179.

However, our supreme court has held that this factor is not as significant where the accident site has "substantially changed" since

the accident. *Langenhorst*, 219 Ill. 2d at 449 (railroad crossing "substantially changed" since accident). Breuhaus, defendant Boeing's chief engineer for air safety, stated that the airport was under construction at the time of the crash, in August 2005. Now, four years later, the construction has likely been completed or has at least proceeded to an extent that the appearance of the airport has changed significantly since the date of the crash. *Ellis*, 357 Ill. App. 3d at 743 (it was not "possible" to view site of airplane crash in the Philippines, since site was altered). In addition, the possibility of viewing the accident site is usually less significant in a product liability case. *Woodward*, 368 Ill. App. 3d at 835 (vehicle accident in Australia). Thus, we cannot find that the trial court abused its discretion in giving little weight to this factor.

Lastly, the court must consider all the other " 'practical problems that make trial of a case easy, expeditious, and inexpensive.' " *Langenhorst*, 219 Ill. 2d at 443, quoting *Guerine*, 198 Ill. 2d at 516-17. Both plaintiffs' and defendants' attorneys maintain offices in Cook County. The Illinois Supreme Court has stated that while little weight should be accorded this factor, a court may still consider it in the *forum non conveniens* analysis. *Dawdy*, 207 Ill. 2d at 179; *Woodward*, 368 Ill. App. 3d at 836.

In sum, we cannot find that the trial court abused its discretion in weighing the private interest factors.

## Public Interest Factors

When deciding a *forum non conveniens* motion, a court must also consider the public interest factors. These factors include: "(1) the interest in deciding controversies locally; (2) the unfairness of imposing trial expense and the burden of jury duty on residents of a forum that has little connection to the litigation; and (3) the administrative difficulties presented by adding litigation to already congested court dockets." *Langenhorst*, 219 Ill. 2d at 443-44, citing *First National Bank v. Guerine*, 198 Ill. 2d 511, 516-17 (2002); *Gridley*, 217 Ill. 2d at 170; *Dawdy*, 207 Ill. 2d at 173.

First, comparative congestion in the respective courts is not a factor in the issue before us. Defendants offered no evidence that there is less congestion in Peruvian courts; they have not even named the specific forum in Peru that they believe should handle these cases. *Woodward*, 368 Ill. App. 3d at 836 (this factor received little weight where defendants "offered no evidence" of less court congestion in their proposed forum); *Berbig v. Sears Roebuck & Co.*, 378 Ill. App. 3d 185, 189 (2007) ("court congestion is a relatively insignificant factor, especially where the record does not show the other forum would

resolve the case more quickly"). In addition, our supreme court has held that "[w]hen deciding *forum non conveniens* issues, the trial court is in the better position to assess the burdens on its own docket." *Langenhorst*, 219 Ill. 2d at 451. Thus, we cannot find that the trial court abused its discretion in giving this factor little weight.

Second, defendants argue that Peru's interest in this case requires a transfer to Peru. We disagree. As the appellate court has stated before, product liability actions are not "localized" cases; they are cases "with international implications." *Woodward*, 368 Ill. App. 3d at 836. Americans, no less than Peruvians, have a specific interest in the safety of the Boeing Model 737 aircraft which fly in our skies. While Peru certainly has an interest in protecting the people who travel in its skies and in determining damages for people injured or killed on its flights, defendants Boeing and UTC are American corporations, and Americans have an interest in ensuring the safety of the products that its corporations build and ship throughout the world, particularly when one of those corporations has its world headquarters here. *Woodward*, 368 Ill. App. 3d at 836 (noting that defendants were "American corporations with extensive foreign business dealings"); *Ellis*, 357 Ill. App. 3d at 743 (noting that defendant's "principal place of business" is in Illinois). While the location of a corporate headquarters is not a "dispositive" factor, it is still a factor we may consider. *Gridley*, 217 Ill. 2d at 173 ("[t]he fact that State Farm's principal place of business is in Illinois, then, is just one factor to be considered"); *Berbig*, 378 Ill. App. 3d at 190. "Illinois's interest in these cases is not unrelated to the interest of the United States as a whole." *Woodward*, 368 Ill. App. 3d at 836.

This case is readily distinguishable from *Berbig*, which involved a choice between two states, not two countries. *Berbig*, 378 Ill. App. 3d at 190. In *Berbig*, this court held that the trial court abused its discretion in denying a *forum non conveniens* motion where the product was manufactured in South Carolina, the accident occurred in Minnesota, and the lawsuit was filed in Illinois. *Berbig*, 378 Ill. App. 3d at 190. By contrast, in the case at bar, defendants did not seek to transfer this case either to Connecticut or Washington, where the aircraft and its engines were designed, manufactured and assembled. That motion would have posed a different question, and may have received a different answer.

The strong American interest in this case is proven by the dominant involvement of both the American defendants, as well as the United States government, in the Peruvian investigation of this crash. The significant parts recovered from the downed airplane—the engine

compressor blades, the cockpit voice recorder and the flight data recorder—were examined and analyzed, not in Peru, but in the United States. They were sent to the laboratories of the U.S. Safety Board, located in Washington, D.C. When the airplane engines were disassembled and examined in Peru, representatives of both defendants were there, taking notes and photographs. Defendant UTC drafted the "Engine Examination Report" that documented the findings, analysis and conclusions made during the engine disassembly. During the site investigation in late August 2005, shortly after the crash, the participants included representatives of both the American defendants, the U.S. Aviation Administration and the U.S. Safety Board. The investigators interviewed both the accident witnesses and emergency response personnel. Even the Peruvian weather conditions at the time of the crash were documented in the United States. The Peruvian report of the crash referred to and relied on the factual report, prepared by the U.S. Safety Board, documenting the climate conditions in Peru at the time of the flight. Defendant Boeing likewise generated a weather analysis, shortly after the accident.

While the defendants have had the opportunity to participate in the initial investigation, and collect evidence and record findings, plaintiffs now have to play catch-up. When defendants, by the account of their own engineers and employees, had apparently full and immediate access to evidence in the foreign forum, it seems disingenuous for them now to argue that they would lack access to evidence if litigation proceeded here. Defendants already had possession and control of the design evidence. It is also disingenuous for defendants to claim now that the United States has little interest in this tragedy, as they are well aware of the American authorities and corporations that dominated the accident investigation.

For all these reasons, we find that Peru's interest in the litigation does not require a transfer.

Third, defendants also argue that Peruvian law will apply and that American courts should not be burdened with applying Peruvian law. Although choice-of-law issues are a factor to consider, they are not usually dispositive. *Woodward*, 368 Ill. App. 3d at 837. "An Illinois court is competent to determine which law applies to this controversy and to apply the law of [Peru] if necessary." *Woodward*, 368 Ill. App. 3d at 837.

In sum, the trial court did not abuse its discretion when it found that the public interest factors did not favor a transfer to Peru, the defendants' requested forum.

## Balancing the Factors

In deciding a *forum non conveniens* motion, the trial court "must balance the private and public interest[ ]" factors. *Dawdy*, 207 Ill. 2d at 172; *Gridley*, 217 Ill. 2d at 169-70. The balancing should be done "without emphasizing any one factor." *Langenhorst*, 219 Ill. 2d at 443; *Gridley*, 217 Ill. 2d at 169; *Dawdy*, 207 Ill. 2d at 180. "On review, the trial court's decision will be reversed only if *** the court abused its discretion in balancing the relevant factors." *Dawdy*, 207 Ill. 2d at 176-77; *Griffith*, 136 Ill. 2d at 106.

In the case at bar, we find that the trial court did not abuse its discretion in balancing the relevant factors. First, plaintiffs' choice of forum merited some deference, although they chose a foreign forum. Second, the private and public interest factors did not weigh strongly in favor of transfer. *Langenhorst*, 219 Ill. 2d at 433 (affirming the denial of a motion to transfer the case to the accident site, even though plaintiff's chosen forum was neither the accident site nor the site of her residence); *Woodward*, 368 Ill. App. 3d at 837-38 (affirming denial of a motion to transfer product liability case, even though plaintiffs' chosen forum was neither the accident site nor the site of their residence); *Ellis*, 357 Ill. App. 3d at 748 (affirming denial of a motion to transfer product liability case, even though plaintiffs' chosen forum was neither the site of the airplane crash nor the decedents' residence).

## CONCLUSION

For the foregoing reasons, we affirm the trial court's order denying defendants' motions to dismiss on *forum non conveniens* grounds. As discussed above, defendants moved to dismiss only in favor of an action in Peru. We find that the trial court did not abuse its discretion in finding that Peru was not a more convenient forum.

Since we find that the trial court did not abuse its discretion in denying defendants' motions on this basis, we do not decide whether Peru was an adequate available forum.

Affirmed.

WOLFSON and GARCIA, JJ., concur.