2022 IL App (1st) 201239

No. 1-20-1239

Opinion filed June 30, 2022

SIXTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| WILLIAM McNULTY III, on Behalf of William McNulty Jr., | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | No. 2020-OP-20091 |
| MICHAEL C. McNULTY, | ) ) ) | The Honorable Stephanie D. Saltouros, Judge, presiding. |
| Respondent-Appellant. | ) | |

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Justices Harris and Mikva concurred in the judgment and opinion.

**OPINION**

¶ 1        Respondent, Michael C. McNulty, appeals the trial court's denial of his motion to vacate a protective order entered against him which protects his father, William B. McNulty Jr., and others. Respondent claims that the parties had agreed to enter mediation and, in return for that promise, he had agreed to the entry of a protective order against him but that no mediation occurred. Claiming that there was no meeting of the minds regarding mediation and the entry of the order, respondent moved in the trial court to vacate the agreed order.

¶ 2    The trial judge, who was the same judge who had entered the agreed order, denied respondent's motion to vacate it, where there was no mention of mediation either in the written order or in open court; where respondent agreed in open court to the entry of the order for two years although the trial court read its conditions aloud and mediation was not among them; where respondent's present counsel represented to the court that prior counsel refused to sign an affidavit stating that mediation was part of their understanding; and where the father's attorney, who was present at the entry of the agreed order, denied any such understanding. For the following reasons, we cannot find that the trial court abused its discretion by refusing to vacate, and we affirm.

¶ 3                                    BACKGROUND

¶ 4    On February 27, 2020, William McNulty III (Bill)[1] filed a petition for an emergency order of protection on behalf of his father, William B. McNulty Jr. (father), and against respondent. The father has three sons: Bill, who filed the petition; respondent, who was the subject of the petition; and Timothy McNulty (Tim), who lived with their father.

¶ 5    In the petition, Bill alleged:

    "[Respondent] carries a firearm at all times and has a concealed carry permit. At 6:05 p.m. on Feb. 25, [respondent] showed up at my father's house and berated him for a variety of reasons. My father had stated to [respondent] in a letter of Feb. 13 that if his behavior did not improve [respondent] would not be invited to the house. [Respondent] has been trying to evict Tim McNulty from [my father's house] against my father's wishes. [Respondent] broke into a locked room and a filing cabinet on Feb.

_____

[1]Since all the men share the same last name, we will refer to respondent as respondent, and the father as father, and the remaining two sons by the names by which they are called, Bill and Tim, respectively.

11 and the Winnetka Police were called to the home at 1 a.m. [Tim and I] are scared that [respondent] will do physical harm to [us] and my father's caregivers are concerned [about] physical harm as well. We are concerned [about] physical violence. We are scared to be at [my father's house] in [respondent's] presence."

¶ 6        At an *ex parte* hearing on February 27, 2020, Bill stated to the trial court that he had power of attorney for his father. Bill then swore that the contents of the petition were true and accurate.

¶ 7        At the February 27, 2020, hearing, Bill testified as follows: respondent, who was 38 years old, was Bill's younger brother, and both Bill and respondent were Marine veterans. Respondent "came back from the war very different *** prone to violent outbursts and verbal abuse." Bill currently resides in California. The last time that respondent was physically violent with Bill was in 2017, when respondent attacked, and Bill "had to subdue him." Their father, although "competent," was "elderly" and "would" have been "here but he don't move that quickly." However, their father was aware that Bill was asking for an order of protection and supported the request. Respondent, who had an "old power of attorney," had sought to evict Tim. Last week, the Winnetka police were called at 1 a.m., after respondent arrived at the house and broke into a file cabinet in a locked room. Their father told respondent "that he couldn't do that." Respondent was drunk, yelling, and telling their father that he was incompetent and that respondent was "going to put him in a mental home." During this altercation, Tim was at the house, but Bill was in California.

¶ 8        After Bill told the trial court that he did not know what happened next because he was not there, the court asked Tim, who was also present, to come forward. Bill then informed the court that his brother Tim had "a learning disability."

¶ 9        After Tim was sworn, Tim testified that he lived with his father in his father's house in Winnetka and helped to take care of his father. Tim testified:

"Whenever [respondent] comes up to the house for [*sic*] when it snows[2]—he's always belittling me, bashing me. In the past, he's come to the house and tried to strike me and hit me actually while I was sleeping and trying to wake me up while berating me. At that time I was not feeling well at all, and I was actually—taken some Nyquil to just knock myself out. And all I just remember is him constantly trying to slap me and hit me and tell me to wake the F up, you know."

¶ 10       Tim testified that the event he described happened "last month" and that he was afraid of respondent and so were his father's caregivers. Tim testified that "this is all in text messages." The trial court then asked to view both the text messages and Bill's power of attorney, which the trial court viewed. Neither the text messages nor the power of attorney are in the appellate record. Tim explained that the text messages were between Tim and his father's caregivers.

¶ 11       Bill then volunteered that he ran "a global nonprofit organization," that respondent had "sent threatening messages to [Bill's] employees that he's going to blow up [the organization's] building," and that Bill had sent respondent "a cease and desist" letter. Bill informed the trial court that their mother was also present in the courtroom, but that she did not live at the father's house because his parents were divorced. Bill told the court that he had become the power of attorney for his father on February 11, 2020, just a couple of weeks ago but that respondent was aware that respondent was no longer the power of attorney. Bill told

---

[2]The protective order issued on February 27, 2020, stated that defendant was permitted to remove " 'his snowplow business equipment' " from his father's property. *Infra* ¶ 12.

the court that he also had "a copy of [respondent's] VA disability rating." The document is not in the appellate record, but Bill apparently read a portion of it into the record, stating that respondent had "a 70 percent rating for suicidal ideation for delusionary thoughts disorder."

¶ 12    At the end of the *ex parte* hearing, the trial court issued an emergency order of protection, protecting Bill, Tim, and their father. The order prohibited respondent from, among other things, entering or remaining in the house or contacting their father. However, respondent was permitted to remove "his snowplow business equipment" on March 2, 2020, at 9 a.m. in the presence of the Winnetka police and was permitted phone, e-mail, and text contact with Bill.

¶ 13    The trial court informed Bill that, if Bill was not present on the next court date, which was March 19, 2020, the court would presume that he "no longer wish[ed] to proceed with this" and that the court would "immediately terminate the order of protection and dismiss the petition." On March 18, 2020, the emergency order of protection was extended to April 17, 2020. When the courts closed down due to the COVID-19 pandemic, the order was continued by way of an administrative order, on a monthly basis, until July 17, 2020.[3]

¶ 14    On July 17, 2020, respondent appeared in court with counsel. None of the other family members were present, and the trial court vacated the emergency order of protection. All of the proceedings in this case were before the same trial judge, except for this July 17 proceeding at which the order was vacated.

¶ 15    Ten days later, on July 27, 2020, Tim filed a petition for an emergency order of protection. In the petition, Tim alleged:

---

[3]The information for this sentence is taken from defendant's verified motion to vacate the protection order. The administrative orders do not appear in the record.

"[Respondent] went to residence [on] 7-26-20 at 10:53 a.m. [and] entered house by back door, spoke to father to request he sign documents. Not only was father not safe (all locks had been changed) [respondent] presumably had access to all financial/health records of father. [Father] and [Tim] [were] in fear of further elder abuse and [losing] care-givers again, because they fear [respondent]."

¶ 16 The transcript for the July 27, 2020, hearing states that it was done by "video-conference." Tim appeared and stated that he was unaware of the prior court date, despite having tried repeatedly to find out when it would be. The trial court stated it was "going to re-enter this because you were unaware of the date *** because of the COVID closure." The trial court entered an order that reinstated the emergency order of protection and that extended the order to August 17, 2020.

¶ 17 At the August 17, 2020, hearing, Tim Carter[4] identified himself as the attorney for the father and stated that he was present with Bill and Tim, as well as with Mark Mitchell and "the caregiver Chara." Carter did not explain who Mitchell was, but later documents indicate that Mitchell was an uncle of Bill, Tim, and respondent. Shawn Jones identified himself as the attorney for respondent, who was also present. Marty McNulty and Peter Haben identified themselves for the record, without indicating their relationship to the proceeding.

¶ 18 After the people present had identified themselves for the record, the trial court observed: "It's my understanding that the parties had an agreed plenary Order of Protection with the protected parties being" the father and Tim. The trial court asked respondent: "are you agreeing to this Order of Protection for a period of two years until August 15, 2022?" Respondent responded: "Yes, Ma'am."

---

[4]We identify the attorney by name because his presence becomes significant at the next hearing.

¶ 19        The court then read the conditions of the order to respondent:

"THE COURT: With respect to this order and those protected persons being, [the father] and brother, [Tim], you are prohibited from committing the following: Physical abuse, harassment, interference with personal liberty, willful deprivation, exploitation and stalking.

You, the respondent, are prohibited from entering or remaining at [the father's house], unless invited by [the father] and in the company of one of the above: Peter McNulty, David McNulty, Mark J. Mitchell, III, or [Bill].

You are further ordered as follows:

You are required to leave the residence at the request of [the father] or any one of the individuals listed ***.

So if [the father], Peter McNulty, David McNulty, [Bill] or Mark Mitchell III, ask you to leave, you have to go.

Do you have any questions about the Order of Protection?

[RESPONDENT]: Not at this time.

THE COURT: All right.

Let the record reflect that the respondent has been served in the open court with this Order of Protection."

The order stated that it expired on August 15, 2022.

¶ 20        Less than 10 days after the agreed protective order was entered, respondent obtained new counsel and filed a motion on September 16, 2020, to vacate the agreed order. Respondent's verified motion asked the trial court to vacate the order pursuant to section 2-1301(e) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1301(e) (West 2018)), which

provides that a court "may on motion filed within 30 days after entry thereof set aside any final order or judgment upon any terms and conditions that shall be reasonable." A verification, signed by respondent, stated that he had read the motion and that he swore that its statements were "true and correct" under penalties of perjury, except to matters stated "to be on information and belief." See 735 ILCS 5/1-109 (West 2018) (a verified document "may be used in the same manner and with the same force and effect as though subscribed and sworn to under oath").

¶ 21    The motion alleged that respondent's "understanding of the parties' agreement was that: in exchange for him agreeing to enter" the order, "the family would 'participate in mediation with a mediator of his choice in the next thirty days for the purpose of vacating' "[5] the order and allowing him "to have contact with, and see his father while under supervision of his brother or uncles pending the resolution of the mediation."

¶ 22    The motion alleged that, after his father had multiple strokes and a heart attack, his father granted respondent power of attorney to manage his father's affairs. For the past 10 years, respondent had, among other things, negotiated his father's bills, visited every 10 days or so to review his father's mail and resolve any issues, secured caregivers, and applied for veteran's aid for his father. His father's pension and social security income were not sufficient to pay his expenses. As a result, respondent and respondent's 94-year-old grandmother had provided financial assistance.

¶ 23    The motion alleged that, when respondent stated that he would no longer be able to provide financial support and began to explore other means of support, such as selling the house, Tim retaliated by trying to have respondent arrested. On February 27, 2020, Tim and

---

[5]The single quote marks are in the original without an indication what is being quoted.

Bill filed an *ex parte* petition for an emergency order which stated, among other things, that respondent had threatened to evict Tim. Respondent argued that this allegation "reflects the true motivations behind the filing" of the petition.

¶ 24 The motion alleged that, after the order was vacated on July 17, 2020, respondent visited his father on July 26 and realized that all the locks had been changed, that respondent's phone number had been deleted from his father's phone, and that respondent's phone number had been blocked by his father's cellular service provider, precluding both incoming and outgoing calls. His father said that he did not know why respondent had not been there to see him, but he had just assumed that his son had been busy. His father invited respondent to move in with him because of "all the violence that was happening in Chicago." Tim called the police, but after the police arrived, they informed Tim that the protective order had expired. On July 27, Tim had the emergency order reinstated, and a hearing was scheduled for August 17, 2020.

¶ 25 The motion described a conversation that respondent alleged that he had with his prior counsel:

"While in Court, [respondent's] attorney told [respondent] that per his conversation with the opposing attorney, if [respondent] agreed to enter a Plenary Order of Protection, they would attend mediation with a mediator of [respondent's] choosing in the next month, in order to vacate the [order of protection]. Also, during that time, [respondent] would still be allowed to communicate with his father, and could visit his father under the supervision of Bill (living in Los Angeles) and/or [respondent's] uncles."

¶ 26 The motion alleged, that, although respondent knew there was no basis for a protective order against him, he thought it was best for the parties to address their family issues in

mediation and reach a resolution outside of court, rather than proceeding with a hearing on the protective order. Respondent believed that "his agreement to enter" the order was "contingent upon them attending mediation in the next month and vacating" the order. Respondent also alleged that he "would have never agreed" to the order if he knew that it "would not be vacated upon him attending mediation, as relayed to him by his attorney" or "if he knew that the family would still preclude him from" speaking with his father.

¶ 27    Respondent further claimed that it was only after he selected a mediator and forwarded the contact information to his attorney that he learned that he could not enforce mediation. In addition, although the order did not preclude all contact, respondent's brothers had precluded respondent from being able to speak with their father. On August 28, 2020, when respondent called his father via Skype, Tim yanked the phone from his father's ear when Tim realized that respondent was the caller. On September 10, his father's attorney notified respondent's attorney that, if respondent agreed not to have any contact with his father for a two-week period, "they would consider going to 'counseling.' "

¶ 28    Bill verified the response to the motion. While the response stated that respondent's motion was "without merit," it did not claim that respondent's understanding of their agreement had no basis in fact. The response quoted respondent's "understanding of the parties' agreement" which was "that in exchange for him agreeing to enter" the order, "the family would 'participate in mediation with a mediator of his choice in the next thirty days for the purpose of vacating' " the order and allowing respondent "to have contact with, and see his father under supervision of his brother or uncles pending the resolution of the mediation." Thereafter, the response simply stated that respondent's understanding was "without merit or statutory support." However, it did not state whether his understanding was a complete

fabrication which had no basis in fact. Instead, the response noted that the form on which the order was written had a box for counseling but that this "box 4" for counseling was not checked. Box No. 4 on the form provides that the subject of the order is "ordered to undergo counseling at ____ for a duration of ____." As the response observed, the box was not checked and the spaces were left blank.

¶ 29    In his reply, dated October 13, 2020, respondent observed that his brother failed to provide "any factual allegations regarding the discussions that lead to the entry" of the agreed order but did not deny respondent's allegations about mediation and their discussions of it.

¶ 30    On November 4, 2020, the parties appeared in open court and the trial court heard argument on respondent's motion to vacate. As previously noted, respondent's motion was considered by the same trial judge who had issued the order and who had presided over every proceeding in the case at bar, except for the July 17 proceeding that had vacated the order for 10 days.

¶ 31    Carter stated that he was appearing for both, the father and Tim, but that neither of his clients were present. Carter had been present at the August 17 proceeding when the agreed order had been entered. Two attorneys were present for respondent. They were new counsel, and neither had been present at any of the earlier proceedings.

¶ 32    Respondent's counsel argued that there was no meeting of the minds and that, as soon as their client realized that fact, he filed this motion to vacate. Counsel argued that "all we're asking for" was a hearing on the merits.

¶ 33    Carter argued that the only reason it was "undisputed that there was conversation about mediation" was "because" he (Carter) was not "present" for conversations between respondent

and respondent's counsel when this alleged conversation occurred. Carter argued that respondent was "essentially alleging fraud on the part of his [prior] attorney." Carter argued:

> "CARTER: But his petition is unaccompanied by an affidavit, and that's so because I spoke to [his prior counsel] who specifically denied that that conversation ever occurred. So it's Respondent's sole word that he believed that happened when, in fact, it didn't.
>
> THE COURT: Wait. Are you saying that you had no conversation with [respondent] that you would agree with your—your clients would agree to engage in mediation with him in exchange for this order of protection? You're saying this didn't happen?
>
> CARTER: It never happened.
>
> THE COURT: Okay.
>
> CARTER: And, in fact the Domestic Violence Act doesn't [contemplate] mediation, because it would be improper to have an abused person engage in mediation with their abuser.[6]
>
> Furthermore, respondent alleges that it would be a mediator of his choosing, which I find absurd. That would be malpractice on my part to even remotely agree to something like that."

¶ 34    Carter explained that "this motion to vacate came about" because he (Carter) called respondent's former counsel on September 8, 2020, to say that respondent had been "calling"[7]

---

[6]Section 214 of the Illinois Domestic Violence Act of 1986 lists the remedies available in an order of protection, and mediation is not one of them. 750 ILCS 60/214(b) (West 2018). A trial court may, however, order the subject of the order to undergo counseling for a specified duration of time. 750 ILCS 60/214(b)(4) (West 2018).

[7]Carter did not identify who defendant had called.

and these calls "could be construed as harassment." A day or two later, Carter received a call informing him that the former counsel had been fired. A week later, on September 16, the motion to vacate was filed by new counsel. Carter stated that he was "prepared for trial when this order was issued"; he had "five witnesses present, one of whom flew in from out of town."

¶ 35     In response, respondent's counsel argued that the fact that mediation was discussed by the attorneys was "never disputed, denied, countered or anything in the response." The trial court noted that Carter had just denied it in open court and that the trial court "accept[ed] Mr. Carter's word." The court then asked respondent's counsel:

> "THE COURT: Do you have an affidavit from this attorney, the prior attorney, indicating that that was the conversation that was had?
>
> [DEFENSE COUNSEL]: I have, actually, an affidavit that he was willing to sign, but then after speaking to the prior attorney he said I don't really feel comfortable signing it. You'll have to proceed without it."

Counsel added, "Where he lies at that point, I don't know."

¶ 36     However, defense counsel argued that he was "willing to have" his client "testify" to his understanding "right now." Counsel stated, "we're not asking that this order be vacated and try the case, all we're asking for is a hearing on the merits."

¶ 37     At the end of the hearing, the trial court made the following findings:

> "THE COURT: My finding is that he was represented by an attorney. This was an agreed order. It was read to him in open court. There was no mention at any time concerning mediation. You do not have any type of an affidavit from the attorney indicating that this was discussed. I have counsel for the other side indicating that [it] was never discussed at all.

And so your motion is denied."

¶ 38 On November 4, 2020, the trial court entered a written order denying respondent's motion to vacate

"based on the court finding that:

(A) Respondent was read the order of protection in open court and agreed be bound by [it].

(B) Respondent was represented by counsel at the time of the entry of the agreed order of protection.

(C) [Bill's] attorney denied that mediation was a condition of the Agreed Order of Protection although this was not raised in the Response verified by [Bill].

(D) The court finds there was a meeting of the minds at the time the agreed order was entered."

¶ 39 On November 17, 2020, respondent filed a timely notice of appeal, and this appeal followed. After the record and appellant's brief were filed, this court took the case on the record and appellant's brief only.

¶ 40                                  ANALYSIS

¶ 41 In the court below, respondent moved to vacate an agreed order, which this court has described as "effectively the parties' private contractual agreement." *Draper & Kramer, Inc. v. King*, 2014 IL App (1st) 132073, ¶ 28. As such, an agreed order is generally binding upon the parties and cannot be amended or varied without the consent of each party. *Draper*, 2014 IL App (1st) 132073, ¶ 28.

¶ 42 Respondent moved to vacate pursuant to section 2-1301(e) of the Code, which provides that a court "may on motion filed within 30 days after entry thereof set aside any final order or

judgment upon any terms and conditions that shall be reasonable." 735 ILCS 5/2-1301(e) (West 2018). Since "a decision whether to grant a motion under section 2-1301 is discretionary," we review a trial court's ruling under this section only for an abuse of discretion. *Draper*, 2014 IL App (1st) 132073, ¶ 26. An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the position adopted by the trial court. *People v. Van Dyke*, 2020 IL App (1st) 191384, ¶ 66. Under an abuse-of-discretion standard of review, "[t]he issue *** is not what decision we would have reached if we were reviewing the facts on a clean slate, but whether the trial court acted in a way that no reasonable person would." *Vivas v. The Boeing Co.*, 392 Ill. App. 3d 644, 657 (2009).

¶ 43        To succeed on a motion under section 2-1301(e), the movant need not show that he or she has either a meritorious defense or a reasonable excuse for not having asserted a defense earlier. *Draper*, 2014 IL App (1st) 132073, ¶ 23. Instead, the overriding consideration is whether substantial justice was done among the parties and whether it is now reasonable, under the circumstances, to force the other side to go to trial on the merits. *Draper*, 2014 IL App (1st) 132073, ¶ 23. In making this determination, a trial court must consider all the events leading up to the entry of the order or judgment at issue. *Draper*, 2014 IL App (1st) 132073, ¶ 23. "What is just and proper must be determined by the facts of each case, not by a hard and fast rule appliable to all situations regardless of the outcome." (Internal quotation marks omitted.) *Mann v. The Upjohn Co.*, 324 Ill. App. 3d 367, 377 (2001).

¶ 44        Respondent argues that his motion should have been "routinely granted" and cites in support *Draper*, 2014 IL App (1st) 132073, ¶ 25. In *Draper*, the court stated: "It is well

15

recognized that motions to vacate under section 2-1301 are routinely granted in order to achieve substantial justice." *Draper*, 2014 IL App (1st) 132073, ¶ 25.

¶ 45    Relying on *Draper*, respondent argues that the trial court held him to the higher standard required for section 2-1401 motions (735 ILCS 5/2-1401 (West 2018)) rather than the lower standard applied to section 2-1301 motions. When making a motion to vacate an agreed order entered 30 days or more ago, the motion must be made under section 2-1401, and the movant must set forth specific factual allegations supporting each of the following elements: (1) a meritorious claim or defense, (2) due diligence in presenting this meritorious claim or defense in the original action, and (3) due diligence in filing the section 2-1401 motion for relief. *Draper*, 2014 IL App (1st) 132073, ¶ 24; 735 ILCS 5/2-1401 (West 2018). By contrast, when the motion to vacate an agreed order is made within 30 days, the motion is made under section 2-1301 instead, and the movant has "a much lower hurdle" to overcome. *Draper*, 2014 IL App (1st) 132073, ¶ 25. All the movant has to show is that "substantial justice was not achieved" by the agreed order. *Draper*, 2014 IL App (1st) 132073, ¶ 25. "This is the movant's 'reward' for filing the motion in a more timely manner ***." *Draper*, 2014 IL App (1st) 132073, ¶ 25. When determining whether substantial justice would be achieved under section 2-1301, a trial court must "still" consider (1) the existence of a meritorious defense, (2) the movant's due diligence or lack thereof in pursuing both (a) the defense and (b) the motion to vacate, (3) the severity of the penalty resulting from the order sought to be vacated, and (4) the relative hardships on the parties from granting or denying the motion. *Draper*, 2014 IL App (1st) 132073, ¶¶ 25, 32-34.

¶ 46    In the case at bar, the record shows that the trial court did not hold respondent to the higher section 2-1401 standard. The trial court did not require him to show either a meritorious

claim or defense to the petition for a protective order or diligent pursuit of such a claim or defense in the original action. All the movant had to show was that substantial justice was not achieved by the agreed order. Yet, at the November 4, 2017, respondent argued primarily that he, personally, would not have agreed to it without the "carrot" of mediation held out by his attorney. Thus, we do not find persuasive respondent's claim that the trial court's denial of his claim was based on the higher section 2-1401 standard.

¶ 47 Defendant argues that all four of the substantial justice factors, listed above, weigh in his favor. See *Draper*, 2014 IL App (1st) 132073, ¶¶ 25, 32-34. As to a meritorious defense, respondent argues that his father has no idea that a protective order is keeping his son, respondent, away from him and that the real motivation of his brothers Tim and Bill is to stop the sale of the house where Tim lives rent free. Respondent claims that he has been diligent, in that he has appeared at every proceeding for which he had notice and he filed his motion to vacate less than 10 days after the agreed order was entered. As to the severity of the penalty and the resulting hardships, respondent alleges that he has been unable to see or speak to his father since the order was entered and that the protective order has jeopardized his national security clearance.

¶ 48 As to the first two factors, the record shows that respondent has been diligent and that there is a credibility dispute about the underlying causes and merits of the order that cannot be resolved on a cold transcript. As to the allegation about his security clearance, respondent cites in support only his own motion and reply. In this case, the most compelling of the four factors is respondent's allegation that he has been unable to see or speak to his father since the entry of the order. However, as the trial court observed, enforcement of the order itself should ameliorate that problem. At the November 4 hearing, respondent argued that he had "not seen

his father or spoken to his father since this [order] was entered." In response, the trial court observed: "There's nothing in this order that indicates [respondent] cannot have contact with the complaining witness. It specifically says he's allowed to have contact at the home if invited by [the father] and in the company of" certain listed persons. The court further observed: "There's nothing that ban[s] any type of contact between the parties." Thus, the court did not find this argument persuasive as a reason for vacating the order.

¶ 49     We agree with the trial court's reading of the order. On the agreed order, the following line is *crossed out*: "Petitioner is granted exclusive possession of the residence and Respondent shall not enter or remain in the household or premises." The following box is *not* checked: "Respondent is ordered to stay away from [his father] and other protected persons, including but not limited to refraining from telephone calls, mail, e-mail, faxes, written notes, and communication through third parties." On the order, respondent is "prohibited from entering or remaining at" his father's house, "unless" (1) he is "invited by" his father and (2) he is "in the company of" *one of* four possible individuals, including his uncles. After examining the order in light of respondent's arguments and the four "substantial justice" factors, we cannot say that the trial court abused its discretion in refusing to vacate it. See *Draper*, 2014 IL App (1st) 132073, ¶¶ 25, 32-34.

¶ 50     Respondent argues that the trial court abused its discretion by considering unsworn statements by opposing counsel, by considering these statements although they were not in opposing counsel's written brief, and by requesting an affidavit by respondent's prior counsel while not requesting opposing counsel to testify or to swear out an affidavit. However, it was respondent's present counsel who informed the trial court that prior counsel refused to sign an affidavit regarding the alleged mediation conversation. Defense counsel represented to the trial

18

court that he had presented prior counsel with an affidavit and that prior counsel had responded: "I don't really feel comfortable signing it. You'll have to proceed without it." Neither we nor the trial court must ignore this representation.

¶ 51    Respondent contends that there was no meeting of the minds between himself and the parties protected in the protective order. However, respondent's verified motion does not allege that anyone but his prior attorney spoke to him about mediation.[8] To the extent that respondent alleges that there was not a meeting of the minds, it appears to be between himself and his prior counsel—based on his own verified statements and the statement of his current counsel in open court.

¶ 52    As for the trial court, it accepted, equally, unsworn statements by both attorneys—by respondent's present counsel and by opposing counsel. If anything, opposing counsel's statements shed some light on respondent's present counsel's statement that prior counsel refused to sign a proffered affidavit about mediation. On these facts, we can find no abuse of discretion by the trial court in accepting opposing counsel's statement, where it offered support for present counsel's representation that prior counsel refused to sign a proffered affidavit and where it had nothing to do with the underlying issue of whether the protected parties needed a protective order.

¶ 53    Respondent's appellate brief relies heavily on *Draper*, 2014 IL App (1st) 132073. In *Draper*, the defendant argued that her motion to vacate should have been granted primarily "because of the gross disparity in the parties' capacities and bargaining positions as [the] defendant was not represented by counsel" while an attorney acted on behalf of plaintiff.

---

[8]Defendant does not allege that anyone spoke to him, or in front of him, about mediation, except for his attorney.

*Draper*, 2014 IL App (1st) 132073, ¶ 3. The uncounseled defendant in *Draper* was a mother in a federally subsidized apartment, whereas plaintiff was a professional and incorporated managing agent for her landlord. *Draper*, 2014 IL App (1st) 132073, ¶ 1. While the defendant was standing outside of the courtroom trying to locate her case number, the plaintiff's attorney approached and asked if she wanted to discuss her case, which they did, arriving at an agreement together. *Draper*, 2014 IL App (1st) 132073, ¶ 6. When her case was called, the defendant asked the court how much she owed for the attorney fees. *Draper*, 2014 IL App (1st) 132073, ¶ 7. In addition, the defendant's motion to vacate asserted that she had meritorious defenses to eviction, including that she did not owe the amounts claimed. *Draper*, 2014 IL App (1st) 132073, ¶ 34. On appeal, this court found that the trial court had abused its discretion by denying the motion to vacate and reversed. *Draper*, 2014 IL App (1st) 132073, ¶ 39. While the *Draper* court stated it was mindful that the standard of review was abuse of discretion, it found "of significance[,] *** the disparity in the parties' bargaining power." *Draper*, 2014 IL App (1st) 132073, ¶ 39. *Draper* is inapposite to the case at bar, where the opposing sides in the instant case were each represented by their own attorney and where there was no allegation of a gross disparity in the respective capacities of the two sides.

¶ 54     Every motion to vacate must be considered on its unique facts, and the facts in this case are certainly unique. *Mann*, 324 Ill. App. 3d at 377 (what is just must be determined by the facts of each case). In the case at bar, prior to entry of the protective order, the trial court asked respondent in open court: "are you agreeing to this Order of Protection for a period of two years until August 15, 2022?" Respondent, who was represented by counsel, responded: "Yes, Ma'am." With this unequivocal answer, respondent agreed to entry of the order for two years, without qualification. The trial court then read its conditions aloud to respondent, one by one,

and asked respondent if he had any questions. Respondent heard the list of conditions and heard that it did not include mediation, but he nonetheless stated that he had no questions about the order that he had just freely agreed to. In respondent's subsequent motion to vacate, respondent claimed that his prior counsel had told him that mediation would be required, and respondent claimed that he had agreed to the entry of the order solely on this basis, although this condition was not stated in open court or in the order. Respondent does not claim that anyone spoke in front of him or to him about mediation, except his attorney. At the hearing on the motion to vacate, respondent's new counsel informed the trial court that prior counsel had refused to sign a supporting affidavit. The trial judge who heard the motion to vacate was the same judge who had presided over all the prior proceedings in this case, except for the one proceeding where the emergency order had been temporarily vacated. On these facts, we cannot find that the trial court abused its discretion in denying the motion to vacate.

¶ 55        With an abuse of discretion standard of review, "the issue for an appellate court is not what we would have done in the first instance—that is irrelevant." *Malloy v. DuPage Gynecology, S.C.*, 2021 IL App (1st) 192102, ¶ 38. "The sole issue for us" is whether no reasonable person could take the view taken by the trial court, and we cannot find that here. *Malloy*, 2021 IL App (1st) 192102, ¶ 38.

¶ 56                                    CONCLUSION

¶ 57        The trial court's denial of respondent's motion to vacate is affirmed.

¶ 58        Affirmed.

2022 IL App (1st) 201239

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2020-OP-20091; the Hon. Stephanie D. Saltouros, Judge, presiding. |
| **Attorneys for Appellant:** | Flavia Pocari and Allen R. Perl, of Perl & Goodsnyder, Ltd., of Chicago, for appellant. |
| **Attorneys for Appellee:** | No brief filed for appellee. |